554

HEIRS OF FELICIANO MUÑOZ PÉREZ ET AL., Plaintiffs and Appellees, *v.* LEONARDO CEPEDA, Defendant and Appellant.

No. 10374.   Argued May 3, 1951.—Decided May 29, 1951.

*Gustavo Cruzado Silva* for appellant. *L. E. Dubón, R. García Cintrón; L. Ríos Algarín,* and *J. Pieras, Jr.,* for appellees.

MR. JUSTICE MARRERO delivered the opinion of the Court.

It is an uncontrovertible fact that Feliciano Muñoz Pérez died of a bullet wound. Also that the bullet which caused said wound was fired by defendant Leonardo Cepeda. The heirs of Muñoz filed an action for damages because of the latter's death. After a trial on the merits, the court rendered jugdment granting the complaint and adjudging defendant to pay to plaintiffs the sum of $10,000 as damages,[1] plus costs and $1,200 attorney's fees.

The fourteen errors assigned by defendant may be reduced to four, to wit: that the lower court erred (1) in not accepting evidence on the bad reputation of the deceased;[2] (2) in weighing the evidence and in acting with passion,

---

[1] The $10,000 of the judgment were distributed by the lower court as follows: $4,500 for the minor Carmen Milagros Muñoz Padilla; $4,000 in equal shares for the minors Félix and Luis Ángel Muñoz Torres, because they had previously received the sum of $2,200 insurance money; and the remaining $1,500 for plaintiff Carmen Padilla.

[2] Assignments 1, 2, and 10 are to the effect that the lower court erred (first error) in depriving defendant from proving through pertinent evidence offered by him, that Feliciano Muñoz Pérez had an aggressive character, that he was troublesome, violent and had a tendency of mingling in discussions and controversies with his own relatives as well as with other persons, and that he had had quarrels and disputes which culminated in serious trouble; that he was in the habit of carrying weapons and that on the day of the killing not only was he intoxicated, but he also carried the revolver with which he fired at appellant, having no permit for carrying weapons, notwithstanding that said facts were alleged in the second special defense of the answer and without their having been previously stricken; (second error) in denying defendant the right to establish the bad reputation of Feliciano Muñoz Pérez, and admitting evidence to that effect, although, while such right was denied to defendant, the court allowed plaintiffs to introduce evidence on his good character; and (tenth error) in refusing to admit the testimony of Antón

prejudice, and partiality;[3] (3) in ordering to strike the answer given by the policeman Lino Rivera, when he said that Andrea Rodríguez had told him that she knew nothing about the facts, on the ground that said policeman had not recorded an entry to that effect in the Police Blotter;[4] and (4) in not admitting in evidence the Police Blotter.[5]

When in cases of this nature defendant maintains that he killed the decedent in self defense, the character and specific acts of violence of the latter are admissible in evidence for the purpose of showing that the deceased was a person of a violent and impetuous character. *People* v. *Castro, ante,* p. 92. However, in order that said evidence be admissible it is necessary to show that defendant had full

---

Álvarez, Felícita Sánchez and Modesto Pedrogo, tending to show the bad reputation and troublesome and aggressive character of Feliciano Muñoz Pérez, based on the fact that said testimonies were immaterial, irrelevant and impertinent, although they tended to prove the allegations contained in the second special defense of the answer.

[3] Errors 3, 4, 5, 6, 7, 11, 12, 13, and 14 allege that the trial court erred (third error) in finding that while the plaintiffs' predecessor, already disarmed, ran from a store located at the site of the killing, towards an eating place also located nearby, defendant fired at him with his revolver, wounding him on the back; (fourth error) in finding as it did in its findings of fact, that defendant wounded plaintiffs' predecessor when Muñoz was fleeing defenseless and unprotected; (fifth error) in finding that decedent at no time fired at defendant, nor aimed his revolver at the latter, nor threatened to do so; (sixth error) in finding that the death of plaintiffs' predecessor was due to the illegal act of defendant, without justified cause; (seventh error) in holding that the testimony of Andrea Rodríguez, a fourteen-year old girl, was convincing and beyond suspicion, as said witness told the policeman Lino Rivera, who took part in the investigation when she was questioned at the site of the events that same afternoon, that she had seen nothing; (eleventh error) in not determining and holding that according to the evidence introduced, said defendant acted in legitimate self defense when he fired the shot that caused the death of Muñoz Pérez; (twelfth error) in weighing the evidence as a whole, because in so doing the court acted moved by passion, prejudice and partiality, as well as in settling the conflict in the evidence; (thirteenth error) in weighing the evidence as a whole from which it derived erroneous conclusions; and (fourteenth error) in granting the complaint disregarding the evidence of legitimate self defense.

[4] This is the eighth error assigned by appellant.

[5] This appears as the ninth assignment of error.

knowledge of the violent and impetuous character of his opponent, prior to the time when he felt compelled to kill him. *People* v. *Varela*, 42 P.R.R. 792, 793–4; *People* v. *Quintana*, 50 P.R.R. 60, 69; *People* v. *Ramírez*, 37 P.R.R. 84; *People* v. *Sutton*, 17 P.R.R. 327, 330; Wigmore on Evidence, Vol. I, Third edition, p. 470, § 63; Warren on Homicide, Vol. 2, permanent edition, p. 348, § 204. Said evidence is admissible to demonstrate the mental state of defendant at the time in which he so acted. Wigmore on Evidence, Vol. II, Third edition, p. 44, § 246. In the case at bar the evidence introduced tended to show, in an uncontrovertible manner, that defendant had no knowledge of the alleged bad character of his opponent. Under those circumstances we cannot agree with appellant that the court erred in not admitting evidence tending to prove such particulars.

■ In cases like the present one it is of great importance to determine whether the proximate and immediate cause of death was the fault or negligence of defendant. If he acted in self defense he should be exonerated of all responsibility. *Méndez* v. *Serracante*, 53 P.R.R. 807. Let us examine, then, the evidence brought before the trial court. To discuss the errors bearing on the weighing of the evidence we deem it advisable to make a summary of all the evidence which the court had before it, in order that it may speak for itself and show whether or not the court weighed it correctly.

■■ Plaintiffs' evidence consisted in the testimony of Carmelo Massari Olmeda, Jorge Valldejulli, Luz María Guzmán de García, Andrea Rodríguez, Ramón Nieves Alicea, Carmen Padilla, María Torres, Miguel Ángel Marrero, and Dr. Ramón Llobet. And that of defendants in the testimony of Dr. Antonio Ramos Oller, Pedro Andino Benítez, Rafael Molina, Rosario Loyola, Lino Rivera Arroyo, Justo Aníbal Lanzó, Jesús Figueroa, Otilio Flores, Antón Álvarez, Modesto Pedrogo, Leonardo Cepeda Costoso, and José Soto Morales. Let us review the testimony of each one, eliminating.

the repetitions in the testimony of each witness and anything that for the purposes of the case before us may be superfluous.

*Carmelo Massari Olmeda* heard two shots, but before that he saw when two automobiles arrived, one behind the other. Cepeda traveled in the front car. He saw the person who traveled in the second car, from the back. When the automobiles stopped, Cepeda left his and went towards the other automobile, returning later to his own. Later he returned to the other automobile with a revolver in his hand; he opened the door of said automobile and pulled out Muñoz Pérez by the arm. The latter was seated at the wheel. When Cepeda pulled Muñoz Pérez out he uttered some words and then turned his back. Then Muñoz Pérez "pulled out a revolver" and Pedro Andino said: "Cepeda, he's going to kill you." Cepeda hid and covered himself behind an automobile. Muñoz Pérez kept close to a sidewalk nearby and fired into the air. When Muñoz Pérez fired, Juan "El Malote" grabbed him from behind, pushed him into a store, and they struggled there. Muñoz Pérez ran out towards a nearby eating house. Cepeda came out from behind the automobile and shot him in the back. Cepeda kept walking towards the person he had wounded, revolver in hand, but Pedro Andino intervened to stop the shooting. The witness heard the two shots after Muñoz Pérez alighted from the automobile. It was a matter of seconds between the first and second shot. Muñoz Pérez ran when he saw he was disarmed and "then the man shot him in the back." Upon being asked "And you told the judge that Muñoz fired when Cepeda was with his back turned?" he answered "Yes, sir, he was walking with his back towards him . . . but he fired into the air." When Muñoz ran towards the eating house he carried no gun.

*Jorge Valldejuli* is a contractor and Muñoz Pérez was his partner. The latter started to work for the witness in 1947 for a weekly salary of $65 and 25 per cent of the benefits. His salaries until the day of his death amounted to

$3,630 plus a percentage amounting to $4,899.30, that is, a total of $8,529.30.

*Luz María Guzmán García* says that about 9:00 or 9:15 o'clock that evening Cepeda passed by in his automobile and right behind him was Feliciano Muñoz in his. Around the corner, Cepeda's automobile stopped, and Muñoz stopped behind him. Cepeda alighted from his automobile and went to Feliciano and told him to "get out, that he was going to burn the seat of his pants." Feliciano did not move and then Cepeda opened the automobile door and pulled out Feliciano by the arm. Feliciano remained standing on the stre*t* with his hands in his pockets. Cepeda went to his automobile and came back with a gun, hid behind Feliciano's automobile and the latter went to a nearby store, stood at the door and fired into the air. The witness saw the bullet hit the ceiling of the store. Also, that Cepeda fired at Feliciano. While Feliciano was in the store, Juan "El Malote" came and disarmed him, locked his arms behind his back and took away the revolver. When Cepeda fired at him Feliciano was standing in the doorway, disarmed.

*Andrea Rodríguez* is fourteen years of age, is in the seventh grade and lives on Costoso Street. About 8:45 p.m. while going to a store, she heard the brakes of an automobile and saw Cepeda in the front seat of a gray automobile and following behind, another black automobile. She saw when Cepeda alighted from his automobile, looked behind it and returned to his automobile. In the meantime Muñoz Pérez was blowing the horn and remained in his automobile. After taking the revolver Cepeda went towards Muñoz's automobile and, angrily, said to him: "Get out if you don't want me to burn the seat of your pants." Muñoz remained in his automobile, Cepeda opened the door and pulled him out by the shirt. At that moment Cepeda had the revolver in his right hand. Muñoz then took two or three steps back and pulled out a revolver. Somebody shouted to Cepeda "Look out, Cepeda" and he "ran behind Muñoz's car and Muñoz

went inside a store." Muñoz fired a shot into the air from the store and after firing into the air he was disarmed, the revolver was taken away from him. Juan Cruz "El Malote" wrestled with Muñoz. After he was disarmed he ran towards another eating place which is near the store. The witness does not know if Cepeda could see the wrestling with Muñoz. When Muñoz went out running disarmed, Cepeda fired at him from behind the car. On being asked "Running with his back towards Cepeda?" she answered "Yes, sir . . . When he was about to enter the eating place he (Muñoz) was wounded." While they were face to face, Cepeda had the revolver in his hands. Muñoz fired first, from the store, into the air.

*Ramón Nieves Alicea* had known the deceased for several years and "as far as I know he enjoyed a good repute." He was a strong man, healthy, between 30 and 40 years old and drank liquor socially.

*Carmen Padilla* is the widow of Muñoz Pérez. He was a contractor and earned a lot of money. She is the mother of Carmen Milagros, who is one year seven months old. He made use of liquors only socially.

*María Torres* had been married to Muñoz Pérez and later divorced him. She has two sons of him, known as Ángel Luis and Félix Enrique, 12 and 13 years old, respectively. She received $2,200 from an insurance policy.

*Miguel Ángel Marrero* is an accountant in the contractors firm of Jorge Valldejuli. He corroborates the latter regarding Muñoz Pérez's income.

*Dr. Ramón Llobet* is a physician and surgeon. On the following morning he was called from the Municipal Hospital. Muñoz Pérez was confined there. "Based on the patient's record he had a wound caused by a bullet which had passed through an arm and penetrated the thorax." It was a bullet wound at the level of the seventh intercostal space in the right side of the chest, and which injured the liver. The trajectory described by the bullet was "towards the inside of the

chest." The cause of death was the shock caused by the bullet wound and the internal hemorrhage. He died about five days later. He was never in a condition to undergo an operation. The autopsy was performed by Dr. Julio Dávila.

So far the evidence of the plaintiffs. Defendant's evidence was as follows:

*Dr. Antonio Ramos Oller* is a physician and at Cepeda's request he examined Muñoz Pérez about the 30th of September 1948. He was wounded, in a state of shock, and "he smelled of liquor."

*Pedro Andino Benítez* lives on Costoso street. From 9:00 to 9:15 in the evening he was reading a newspaper in front of his *cafetín* and eating place. He saw an automobile followed by another. In turning the corner of Villarán Street the front car stopped and the second, which was blowing its horn, struck the rear of the first automobile. Cepeda alighted from the automobile, opened the door of the second automobile and the driver alighted. They had a dispute. He heard when the other answered "Go away, you dirty negro." Then the witness said to Cepeda "Let it go, that man is drunk." They took about four steps. He saw that Muñoz Pérez took out a revolver, and the witness then said: "Look out, Nando, you're going to be killed." He saw when Muñoz Pérez fired one shot. At that moment Cepeda had no revolver in his hands. The witness went into his establishment and heard a shot. He then saw Muñoz and told him: "Get inside, Feliciano, you're wounded." He then ran out and told Cepeda that Muñoz was wounded, and then Cepeda went to his automobile. The witness went to the telephone and called Police Headquarters. The wounded man was then taken to the hospital. Muñoz Pérez fired in the direction of Cepeda. He knows Juan Cruz "El Malote" but he does not know in what way he intervened in the matter. Cepeda wounded Muñoz Pérez. It was not until after Cepeda fired that he saw him with a revolver.

*Rafael Molina* is a first lieutenant in the Insular Police. The night of the events he saw Muñoz Pérez in a stretcher in the Municipal Hospital. Muñoz Pérez sent Loyola to ... (obscene word). Having objected to what Muñoz Pérez had said to Loyola, the court sustained the objection and said: "I am not going to permit a policeman to come here to testify something he did not enter in the Police Blotter."

*Rosario Loyola* was a Commandant at Police Headquarters in San Juan and was so on September 30, 1948. He went to the Municipal Hospital that night to see Muñoz Pérez. He was tied to a stretcher. He made no entry in the Police Blotter because he was not the commandant of the post. Muñoz Pérez was wounded, prostrated, struggling to free himself from the ties. He asked Muñoz Pérez who had wounded him and Muñoz answered "Go to ... (obscene word)." The court ordered the elimination of those words. Muñoz Pérez was from 38 to 44 years of age, a strong man, apparently in good health and he weighed from 170 to 180 pounds.

*Lino Rivera Arroyo* is a policeman and the night in question he was on duty at Headquarters in Stop 19. He saw Feliciano because of a call he received. He went to the Municipal Hospital and saw that Muñoz was intoxicated, and in a violent attitude. He also went to the place of the occurrence and made an investigation. He questioned *Andrea Ramírez* that same night. Andrea is a little girl who was with another lady. When he said that *Andrea Ramírez* had told him that "she knew nothing" the court ordered to strike those words and defendant took an exception. He recorded in the Police Blotter the entry shown to him and he says that he knows nothing personally. Plaintiffs objected to the admission of the book and the court sustained the objection.

*Justo Aníbal Lanzó* was standing at the corner of Costoso and Villarán Streets between 8:30 and 9:00 p.m. He saw two automobiles coming. The one behind collided

with the one in front. They stopped. Cepeda alighted from his automobile and went to Feliciano and said to him: "It seems you intend to smash my automobile. I do not know you . . . if you are drunk, you cannot drive; get out, that I'll get someone to drive for you." Cepeda started calling somebody to drive the automobile. Feliciano said "All right." When Cepeda turned his back, Feliciano reached inside his shirt and took out a revolver. Someone shouted: "Look out, Cepeda, they kill you." Cepeda hid behind Feliciano's car and the latter "fired one shot at him." Feliciano ran into the store. He stood at the doorway pointing out with the revolver. "Then Cepeda ran forward and it was then that he fired one shot and wounded him at the door." Feliciano dropped the revolver when he was shot and Juan Cruz picked it up. Feliciano ran towards another store and went into Pedro Andino's home and the latter said "Don't fire anymore because you hit him, and then Cepeda went away." It was then that the wounded man was taken to the hospital.

While *Jesús Figueroa* was standing in front of Pedro Andino's *cafetín*, he saw Muñoz Pérez take his hand to his waist and pull out a revolver. He heard Pedro Andino shout "Cepeda, they kill you" and at that moment Muñoz Pérez fired a shot at Cepeda. Then Muñoz Pérez ran into the store. Cepeda had not fired at him before that. When Cepeda fired, Muñoz had the revolver in his hand and was looking for Cepeda. Muñoz Pérez dropped the revolver when he was wounded. He did not see anyone disarm Muñoz.

*Otilio Flores* knows nothing of what happened.

*Antón Álvarez* is questioned regarding Muñoz Pérez's reputation and when plaintiffs object, the defendant informs that he is going to prove with the witness that Felícita Sánchez was the victim of a shot fired at her by Muñoz Pérez.

*Modesto Pedrogo* was called to testify that Muñoz Pérez was one evening at the Sierra Country Club after it was closed and in a violent manner demanded that it be opened. The court sustained an objection to said examination.

564

*Leonardo Cepeda Costoso* is the owner of a laundry as well as of a building in Costoso Street. The janitor of the building called him and asked Costoso to bring him $60. While he was driving to Costoso Street a Kaiser automobile crossed in front of him and when he drove way out to the side the same automobile "blocks my way." That automobile was being driven by a man he did not know and "he's dead and I don't know him." Then he turned on Costoso Street and decided to alight from his automobile to see who was pursuing him. He asked the driver of the other automobile "My friend, what have you against me . . . that you pursue me?" That other man had his head hanging down; he was intoxicated. Cepeda told him "You cannot go on driving," and asked the boys around there to look for someone to take him home. Then the man gets out of the automobile and tells him "Go to hell, you dirty nigger, son of a bitch, get out of here." Pedro Andino told the witness to pay no attention, and after taking three or four steps Andino said: "Cepeda, be careful, he will kill you." That was so because Muñoz Pérez pulled a revolver .38 caliber Special Police out of his holster. Then he (Cepeda) hid between the hood and the top of Muñoz Pérez's automobile and looked for Muñoz, not to kill him but to defend himself. Then Muñoz fired to where the witness was. While Muñoz Pérez waylaid him, Cepeda fired at his arm and when the former was hit by the bullet his revolver fell down, and a boy called Juan picked it up and said to Cepeda: "Don't shoot any more because he is wounded." He is dead but Cepeda doesn't know Feliciano. He fired at him because Muñoz aimed at him and pursued him with the same revolver with which he had fired at him before. Between the shots only ten or fifteen seconds elapsed. He did not shoot to kill but at his arm. Although Muñoz Pérez collided with the rear of his automobile, Cepeda was not angry, nor violent and when he alighted from the automobile he was friendly. When Muñoz uttered the obscene words already quoted, Ce-

peda did not say anything because the other smelled of rum. After shooting he went to Police Headquarters and gave up his revolver.

*José Soto Morales* arrived at the precise moment when the incident had ended and saw nothing.

In view of this evidence the lower court in the course of its opinion made the following findings of fact:

1. That Feliciano Muñoz Pérez died on October 5, 1948, leaving as his sole and universal heirs, his legitimate children and his widow, plaintiffs herein.

2. That the deceased was, at the time of his death, in the prime of his life, 35 years of age and a strong and healthy man, on whom all the plaintiffs depended for their maintenance and support.

3. That at the time of his death Muñoz Pérez worked as a contractor, in partnership with the engineer Jorge Valldejuli, and had a fixed weekly allowance of $65 and 25 per cent of the benefits, all of which amounted annually to approximately $8,000.

4. That on September 30, 1948 between 8:00 and 9:00 p.m., defendant Cepeda was driving an automobile along the streets of Santurce, having stopped it at a place near the corner of Costoso and Villarán Streets; that at the same time another automobile driven then and there by Muñoz Pérez also stopped behind Cepeda's automobile.

5. That defendant Cepeda alighted from his automobile and after examining the rear of the car, returned to his automobile from which he took a revolver, walking then towards the automobile of Feliciano Muñoz Pérez, who still remained seated inside, on the driver's seat, blowing his horn.

6. That when Cepeda arrived near the automobile driven by Muñoz Pérez, he stood on its left side in front of the place where Muñoz Pérez was sitting and addressing the latter in a violent manner told him: "Get out if you don't want me to burn the seat of your pants."

7. That Muñoz Pérez did not reply, and remained inside his automobile from where he was pulled out violently by defendant when the latter opened the automobile door pulling him by the shirt unto the street.

8. That while he was pulling Muñoz Pérez violently off his automobile, Cepeda was carrying a revolver in his right hand.

9. That when Muñoz Pérez was pulled out of his automobile by defendant, he took two or three steps backwards, pulled out a revolver, and going to a nearby store situated at a distance of 25 or 30 feet, he fired into the air with his revolver.

10. That when Muñoz Pérez pulled out his revolver someone shouted: "Look out, Cepeda," whereupon Cepeda ran towards Muñoz Pérez's automobile behind which he hid himself.

11. That after Muñoz Pérez fired into the air from the store, he was immediately disarmed by Juan Cruz, alias "El Malote." [6]

12. That after he was disarmed, Muñoz Pérez went out of the store running towards a nearby eating place.

13. That while Muñoz Pérez, already disarmed, was running from the store towards the eating place, defendant fired at him and *wounded him on the back.*

14. That Muñoz Pérez died as a result of the shot fired by defendant, the bullet which wounded him passing through the right lung and the liver killing him.

15. That defendant wounded plaintiffs' predecessor when the latter was running away defenseless and unarmed.

16. That when defendant *wounded* Muñoz Pérez *on the back* the said defendant did not act in self defense, he was in no danger of losing his life or of suffering any bodily injury, nor had he any reason to believe that his life was in danger or that his person was exposed to bodily injury.

17. That Muñoz Pérez at no time fired at defendant, nor aimed his revolver at him nor threatened to do so.

18. And that the death of Muñoz Pérez was caused by the wrongful act of defendant and without a justified cause.

The lower court immediately sets forth that the evidence was contradictory but that "taking into account the credit that each witness deserved, it is of the opinion that the events occurred in the manner testified by the witnesses for plaintiffs"; that among the witnesses for plaintiffs, the court wished to "make special mention of the testimony of witness Andrea Rodríguez, a girl fourteen years old, a seventh grade

[6] Although several witnesses referred in their testimony to Juan Cruz, alias "El Malote," the latter, as we have seen, was not called to testify by any of the parties.

student, whose testimony was convincing in all its parts and beyond suspicion" and that "on the contrary, defendant's witnesses, whom the court saw and heard did not deserve any credit."

We have repeatedly read, calmly and thoroughly, the whole transcript. Each and every one of the findings of fact of the lower court are, in our opinion, sustained by the evidence. The only exception consists in that in its findings 13 and 16, *supra*, the lower court states that Cepeda wounded Muñoz Pérez in the back. Although several witnesses for plaintiffs testified to that effect, the testimony of Dr. Llobet, a witness for plaintiffs also, shows the opposite. Appellees themselves in arguing the third error assigned, agree that the court erred in making such assertion in its findings.[7] Nevertheless, it does not change the situation. If according to the decision of the trial court, when defendant fired at Muñoz Pérez he did not do so in self defense, for the purposes of the case before us, it is immaterial whether the wound received by the deceased was in the back or as Dr. Llobet said, through an arm and penetrating the torax. The appeal is taken from the judgment and not from the reasoning of the opinion. *Bird* v. *Bird*, 69 P.R.R. 342; *Latorre* v. *Cruz*, 67 P.R.R. 696.

It is a general and well-settled rule in this Court that the findings of fact are accepted on appeal unless in weighing the evidence the lower court commits manifest error, or acts with passion, prejudice or partiality. *Figueroa* v. *Picó*, 69 P.R.R. 372; *Bird* v. *Bird, supra; Rivera* v. *Casiano*, 68 P.R.R. 177; *Robles* v. *Guzmán*, 67 P.R.R. 671, 674. It cannot be said in this case that the weighing of the evidence made by the court *a quo*, was manifestly erroneous. Nor is there a showing in the record to hold that the trial judge acted with passion, prejudice or partiality.

As to the eighth error assigned [8] it will suffice to

---

[7] See page 10 of appellees' brief.

[8] See footnote 4

say, that even accepting for the sake of argument, that the lower court erred in striking from the record the statements of the policeman Lino Rivera to the effect that Andrea Rodríguez had told him that she knew nothing of the case, on the ground that said policeman did not make such entry in the Police Blotter, such error is not reversible. In the first place, policeman Rivera did not refer, in any way, to Andrea Rodríguez but to Andrea Ramírez. It is possible that Andrea Ramírez might be another person. And in the second place, even if the purpose had been to impeach the testimony of Andrea Rodríguez, such impeachment was rather directed to the credibility of the witness; but even if we should strike her entire testimony, we would find that in the record there is sufficient evidence, believed by the lower court, to support its findings.

■ As said in *Caraballo* v. *P. R. Ilustrado, Inc.*, 70 P.R.R. 265, 271 "The police blotter has no clear and definite legal status, and according to the authorities as a public record it is an enigma." In this case said book was offered in evidence to show that policeman Rivera Arroyo had recorded therein that in carrying out the investigation, Andrea Rodríguez informed him that she knew nothing of the case. Accepting, without deciding, that it was an error of the trial court not to admit it in evidence, we may repeat here what we previously said on the matter, to the effect that, even if we struck the entire testimony of said witness, there would always be in the record sufficient evidence, believed by the court, to support its findings.

■ On the other hand, the lower court did not commit a reversible error in not admitting in evidence the testimony of Rafael Molina and Rosario Loyola, with regard to what the deceased told them while he was wounded in the hospital. It will be remembered that the reason why the court refused to admit said testimony was that the policemen had not recorded in the Police Blotter the statements made by Muñoz Pérez. Although it was an error not to admit said state-

ments on the ground pointed out, since they tended to prove the violent temper of the deceased, and as Cepeda was not aware of such temper, the evidence to that effect was inadmissible.

The judgment appealed from will be affirmed.

